# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6486 | **DATE** | 3/7/2002 |
| **CASE TITLE** | United States of America vs. Lamplight Equestrian Center, Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment (Doc. No. 9) as to liability is granted. Lamplight's motion for summary judgment (Doc. No. 20) is denied. Status conference is set for April 9, 2002 at 9:00 a.m., for purposes of scheduling an evidentiary hearing on the appropriate amount of damages.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 0 8 2002 | |
| | Notified counsel by telephone. | | date docketed | 38 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/7/2002 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 6486 |
| | ) | |
| LAMPLIGHT EQUESTRIAN | ) | Judge Rebecca R. Pallmeyer |
| CENTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

MAR 0 8 2002

## <u>MEMORANDUM OPINION AND ORDER</u>

Lamplight Equestrian Center, Inc. ("Lamplight") owns approximately 52 acres of land at 6N940 Dunham Road in Wayne, Illinois (the "Property"), on which it operates facilities for equestrian shows and other horse-related activities. In 1999, Lamplight built a small road across the southern portion of the Property. The Army Corps of Engineers (the "Corps") claims that a portion of the Property is a wetlands, subject to the Corps' jurisdiction under the Clean Water Act (the "Act"). By failing to obtain the Corps' authorization to discharge sand and clay fill into the alleged wetland, Plaintiff contends, Lamplight violated Section 301 of the Act, 33 U.S.C. § 1311. Lamplight argues that the Supreme Court's decision last year in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (hereinafter, "*SWANCC*"), significantly narrows the Corps' jurisdiction. Under *SWANCC*, Lamplight urges, the wetlands on the Property are not subject to the Corps' authority. Before the court are the parties' cross-motions for summary judgment.

## FACTUAL BACKGROUND

In 1993, Lamplight hired Hey and Associates, an environmental consulting firm specializing in wetlands and natural land management, to conduct a field delineation of wetlands on the Property. (Plaintiff's Local Rule 56.1(a) Statement Of Material Facts As To Which There Is No Genuine Issue ("Plf. Facts"), ¶¶ 6-7; Lamplight Equestrian Center, Inc.'s Local Rule 56.1(B) Response to Plaintiff's Statement of Material Facts ("Lamplight 56.1(B)"), ¶¶ 6-7.) Hey concluded in its June 16, 1993 report that the Property contained two wetlands totaling about 8.3 acres that were "not isolated but . . . above the headwaters of Brewster Creek." (Plf. Facts, ¶ 7; Hey and Associates Report to Lamplight, June 16, 1993, Exhibit 5 to Plf. Facts ("Hey Report"), at 1; Lamplight 56.1(B), ¶ 7.) Brewster Creek is not on the Property, but lies south of it. (Lamplight's Opposition to Plaintiff's Motion for Summary Judgment ("Lamplight's Opposition"), at 2.) The Hey Report evaluated the quality of the two wetlands and noted that both are indicated on the National Wetland Inventory Map.[1] (Hey Report at 1.) The wetlands have been expanding in area since 1981. (Plf. Facts, ¶ 8; Lamplight 56.1(B), ¶ 8.) Following periods of very hot weather, around 95 degrees, without rain, the wetlands become dry. (Plf. Facts, ¶ 9; Lamplight 56.1(B), ¶ 9.) Thomas Moxley, one of Lamplight's shareholders, testified in his May 15, 2001 deposition that although the water levels vary, he has not seen the wetlands

---

[1]     The parties have not explained who produces and maintains the National Wetland Inventory Map, nor what standards are used to identify wetlands for inclusion on the Map.

completely dry up in the last five years. (Moxley Deposition, Exhibit 3 to Plf. Facts, at 24-25.)

According to Lamplight, the Property, historically farmland, was drained by underground clay tiles so that it could be farmed.[2] (Lamplight Equestrian Center, Inc.'s Statement of Material Facts As To Which There Is No Genuine Dispute ("Lamplight Facts"), ¶ 9.) At some point before Lamplight acquired the Property, one of the underlying drainage tiles was cut.[3] (Lamplight Facts, ¶ 9-10.) The cut tile was never repaired; instead, sometime in the 1970s, a prior owner who farmed the Property excavated a drainage ditch to carry water away from the southern wetlands area. (Plf. Facts, ¶ 12; Lamplight 56(B), ¶ 12; Lamplight Facts, ¶ 11.)

With respect to the drainage ditch and the water therein, the parties' characterizations diverge. The Corps asserts that the ditch carries water away from the Property and that, at its end, the water flows above ground into a delta area, which flows west and downhill to Brewster Creek. Brewster Creek drains into the Fox River, and the Fox drains into additional interstate waterways. (Plf. Facts, ¶ 12.) Lamplight, on the other hand, states that "the ditch does not typically convey water but simply drains the surrounding property. . . . [ and it] may drain the wetland when it rains and

---

[2]    The record does not indicate when the underground clay tiles were first installed.

[3]    Lamplight did not identify when it acquired the Property, nor when or how the drainage tile was cut.

may convey water after a heavy rain."[4] (Lamplight Facts, ¶ 12.) Lamplight further claims that drainage travels off the Property westward via a non-continuous "meandering drainage swale" to a tributary of Brewster Creek. (Lamplight Facts, ¶ 16-17.) The drainage ditch, according to Lamplight, ends 50 feet east of this meandering swale. (Lamplight Facts, ¶ 18.) Moxley testified in his deposition that the line of water between the drainage ditch and the delta flowing westward downhill to Brewster Creek had, in the last year, become unbroken. (Moxley Dep., Exhibit 3 to Plf. Facts, p. 33.) Lamplight acknowledges that there is a hydrological connection between the wetlands at issue and the tributary to Brewster Creek after rain events and during certain (presumably wet) seasons. (Lamplight Facts, ¶ 21.)

In December of 1993, Lamplight sought confirmation from the Army Corps of Engineers that it was authorized under Nationwide Permit 26 to fill small portions of its wetlands for, among other purposes, a parking area.[5] (Plf. Facts, ¶ 10; Lamplight 56.1(B), ¶ 10.) Lamplight did not request or receive approval to construct any small road or path during this approval process, (Plf. Facts, ¶ 10; Lamplight 56.1(B), ¶ 10), and did not, at any time, seek or obtain a permit to place fill on its wetlands to build a road or path. (Plf. Facts, ¶ 15.) Lamplight nevertheless proceeded to build a small road or path through its wetlands in 1999, using clay fill. (Plf. Facts, ¶ 14; Lamplight

---

[4]    The court is uncertain there is any meaningful distinction between actually conveying water, and merely draining the property, nor has Lamplight explained such a distinction.

[5]    It is not clear what type of fill Lamplight used for the parking lot.

56.1(B), ¶¶ 10, 14.)

A private wetlands consultant who worked as a contractor for the Village of Wayne informed the Corps about Lamplight's new road.[6] (Lamplight's Memorandum in Support of its Motion for Summary Judgment ("Lamplight Memo"), at 2.) In August of 1999, Keith Wozniak, the Chief of the West Section of the Regulatory Branch of the Chicago District of the Corps, visited the Property and saw that fill material consisting of clay and sand had been placed on the Property's wetlands. (First Affidavit of Keith Wozniak ("Wozniak Aff. 1"), Exhibit 8 to Plf. Facts, at ¶¶ 1, 2, 4.) On September 3, 1999, Wozniak sent Moxley of Lamplight a letter charging that Lamplight was in violation of Section 301 of the Act, and directing Lamplight both to submit a plan for removal of the fill for the Corps' approval within 30 days and to carry out the removal within 60 days. (Lamplight Memo at 2; Letter from Wozniak to Moxley dated September 3, 1999, Exhibit 6 to Lamplight 56.1(B).)

On September 17, 1999, Stephen Cooper, a Lamplight shareholder, as well as its attorney, responded with a letter stating that Lamplight intended to comply with the Corps' requests and requesting a meeting with Corps representatives at the Property to help resolve the issue. (Letter from Cooper to Wozniak dated September 17, 1999, Exhibit 6 to Lamplight 56.1(B).) As reflected in a subsequent letter dated January 28, 2000 from Cooper to Wozniak, Wozniak met with Vince Mosca of Hey and Associates (who apparently attended the meeting on behalf of Lamplight) at the

---

[6]     The record does not identify the name of this wetland consultant, nor precisely when he informed authorities about Lamplight's road.

Property on January 24, 2000. (Letter from Cooper to Wozniak dated January 28, 2000, Exhibit 6 to Lamplights' 56.1(B).) Cooper's January 28 letter confirmed that Lamplight intended to remove the fill and informed Wozniak that Cooper had requested bids and starting dates from two excavators. (Letter from Cooper to Wozniak dated January 28, 2000, Exhibit 6 to Lamplight 56.1(B).) Lamplight alleges that its contractor repeatedly delayed removing the fill.[7] (Lamplight Facts, ¶ 7.)

After approximately seven months went by with no progress on the removal of the road, the Corps, on August 7, 2000, again ordered Lamplight to submit a restoration plan within 10 days of receipt of the order, and to complete all restoration work within 30 days. (Letter from Lisa Noller, Assistant United States Attorney, to Moxley dated September 28, 2000, Exhibit 6 to Lamplight 56.1(B).) The Corps asked the United States Attorney to intercede and initiate an enforcement action against Lamplight. (Letter from Lisa Noller, Assistant United States Attorney, to Moxley dated September 28, 2000, Exhibit 6 to Lamplight 56.1(B).) Offering Lamplight one last chance to comply and avoid litigation, Assistant United States Attorney Lisa Noller wrote a letter to Moxley on September 28, 2000 warning that if Lamplight and did not file a restoration plan by October 6, 2000, and restore the Property to its original condition by October 13, 2000, an enforcement action would be filed against it. (Letter from Lisa Noller, Assistant United States Attorney, to Moxley dated

---

[7]     Lamplight does not identify what it did in response to these alleged delays, nor does it appear that Lamplight made any effort to find another contractor to do the work.

6

September 28, 2000, Exhibit 6 to Lamplight 56.1(B).) Plaintiff filed its complaint on October 18, 2000. (Complaint, Exhibit 1 to Plf. Facts.) Five days later, on October 23, 2000, Cooper sent Noller a letter and left her a phone message, both stating that the fill had been removed and apologizing for the delay. (Letter from Cooper to Noller dated October 23, 2000, Exhibit 6 to Lamplight 56.1(B).) In this lawsuit, Plaintiff asks this court to impose penalties on Lamplight for its alleged violation of the Act, and seeks "appropriate," though unidentified, injunctive relief to restore the wetlands.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). When presented with cross-motions for summary judgment, the court considers the motions simultaneously and draws all reasonable inferences in favor of the party opposing a particular motion. *Buttitta v. City of Chicago,* 803 F. Supp. 213, 217 (N.D. Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993). This "Janus-like perspective" can result in the denial of both motions if material facts are disputed. *Id.* In this case, the central issue is whether the Corps has jurisdiction over the wetlands, especially after the

*SWANCC* ruling.

## The Corps' Authority Post-*SWANCC*

The facts of the alleged violation alleged here are not in dispute; Lamplight discharged fill onto its wetlands to construct a pathway for horses without a permit from the Corps. If the Corps has jurisdiction over those wetlands, Lamplight was required to obtain such a permit and violated the Act by not doing so. The gravamen of Lamplight's argument for summary judgment is that the Corps does not have jurisdiction over the Property's wetlands. Lamplight argues that *SWANCC* significantly reduced the Corps' jurisdiction under the Act, leaving the Property out of the Corps' reach. Plaintiff, on the other hand, takes a narrower view of the *SWANCC* holding, one that contemplates the Corps' continued authority over the wetlands.

In *SWANCC*, a consortium of 23 suburban Chicago municipalities purchased an abandoned sand and gravel pit with excavated trenches for use as a disposal site for baled nonhazardous solid waste. *SWANCC*, 531 U.S. at 162-63. The trenches had, over time, filled with water, and had developed into permanent and seasonal ponds that had become a habitat for migratory birds. *Id.* at 163-64. Petitioners contacted the Corps to determine whether, under § 404(a) of the Act, 33 U.S.C. § 1344(a), they needed a landfill permit to dump fill into the area. *Id.* Under that section, the Corps has authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." Id.; 33 U.S.C. § 1344(a). The Act defines "navigable waters" as "waters of the United States, including the territorial seas." 33

U.S.C. § 1362(7). The Corps issued regulations further defining "waters of the United States" to include, *inter alia*:

> waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce . . .

33 CFR § 328.3(a)(3) (1999).

Further expanding on this regulation, the Corps issued the Migratory Bird Rule, 51 Fed. Reg. 41217, which provides that the Corps has jurisdiction over any waters that provide habitat for migratory birds. *Id.* at 163-64. The Corps invoked that Rule in refusing to issue a permit to the *SWANCC*. *Id.* at 164. Petitioners unsuccessfully challenged that decision in district court, and the Seventh Circuit affirmed, concluding that the Migratory Bird Rule was a reasonable interpretation of the Act. *Id.* at 166; *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 191 F.3d 845, 851-52 (7th Cir. 1999.) The Supreme Court granted certiorari and reversed. The Court determined that allowing the Corps to "claim federal jurisdiction over ponds and mudflats falling within the 'Migratory Bird Rule' would result in a significant impingement of the States' traditional and primary power over land and water use."[8] *Id.* at 174. The Court concluded that 33 CFR § 328.3(a)(3) (1999), "as clarified and applied to petitioner's balefill site pursuant to the 'Migratory Bird Rule,' . . . exceeds the authority granted to [the Corps] under § 404(a) of the [Act]." *Id.*

---

[8] There is no evidence in the record that any local or state entity has voiced any opinion, either in opposition to or in support of, the road Lamplight constructed.

9

Courts interpreting *SWANCC* have reached varying results, the primary rift being whether the Migratory Bird Rule was the decision's only casualty, or whether the holding limited the Corps' jurisdiction even further. The Fifth Circuit took the latter position in *Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001). The *Rice* court observed that, under *SWANCC*, "it appears that a body of water is subject to regulation under [the Act] if the body of water is actually navigable or is adjacent to an open body of navigable water." *Id.* at 269. As Plaintiff points out, the Fifth Circuit's statement is probably only *dicta*: the landowners who sought recovery from an alleged upstream polluter in that case were unsuccessful because there was evidence only of oil discharge onto dry land rather than into any body of surface water.[9] *Id.* at 270-71.

Nonetheless, it appears that the remainder of courts considering the issue have reached the opposite conclusion: that *SWANCC* struck the Migratory Bird Rule, pushing "isolated waters" that may *affect* interstate commerce out of the Corps' jurisdiction, without altering the Corps' reach where its jurisdiction is based on a

---

[9]     In *Rice*, plaintiff-landowners sought damages under the Oil Pollution Act ("OPA"), for damage to their land allegedly caused by defendant's discharge of pollutants into Big Creek and its unnamed tributaries. *Rice,* 250 F.3d at 265. Although the case was brought under OPA, the court followed precedent under the Clean Water Act to define the term "navigable waters" under OPA. *Id.* at 267. The court first held that groundwater is not covered under OPA because there was no reason to construe the term "waters of the United States" more expansively in OPA than it is construed under the Act. *Id.* at 270. Thus, plaintiffs had no claim under OPA with respect to discharges that contaminated the groundwater under their property. *Id.* Additionally, the court found that it would be an "unwarranted expansion" of OPA to find that discharges onto land that only infrequently carried running water were discharges into navigable waters. *Id.* at 271.

water's use or potential use as a channel of interstate commerce. The Ninth Circuit was the first to do so in a case where it concluded, post-*SWANCC*, that man-made irrigation canals remain "waters of the United States" because they were not isolated waters like the ponds in *SWANCC*, but instead exchanged water with, and were therefore tributaries to, natural streams. *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001). *Headwaters* was a citizens lawsuit challenging an irrigation district's use of herbicide in irrigation canals. The *Headwaters* court concluded that *SWANCC* did not affect the reach of the Clean Water Act in its case because the waters at issue were not isolated waters like the ponds in *SWANCC*, but instead, were tributaries to "waters of the United States." *Id.*

At least six lower courts, including two in this Circuit, have followed *Headwaters*' lead in declining to read *SWANCC* as a broad reduction of the Corps' authority to regulate waters under the Act. Following the Ninth Circuit's reasoning in *Headwaters*, the Court of Federal Claims observed that, under *SWANCC*, it is clear that the Corps lacks jurisdiction if there is no nexus between wetlands and the interstate channel. *Brace v. United States*, No. 98-897, __ Fed. Cl. __, 2002 WL 243761 at *4, *5 (Fed. Cl. Feb. 11, 2002). In *Brace*, plaintiff brought a takings clause challenge to the Corps' decision ordering plaintiff to stop using the drainage system on his property and to restore part of the property to wetland status. *Id.* The court denied the government's summary judgment motion on this claim but indicated that the claim would fail if there was sufficient evidence to determine that a nexus existed between

the property and the relevant interstate water. *Id.* Similarly, in *Colvin v. United States*, Nos. ED CV 01-361-RT, ED CR 97-32-RT, __ F. Supp. 2d __, 2001 WL 1720273 at *3 (E.D. Cal. Dec. 28, 2001), the court denied Colvin's motion to vacate his conviction on a charge of discharging pollutants into navigable waters on the basis of *SWANCC*. The jury was instructed that the body of water in question (the Salton Sea) was a "water of the United States" if it attracted migratory birds; the jury was also instructed, however, that use of the water for recreational purposes also supports such a conclusion, and the court concluded that instruction was not altered by *SWANCC*.

A Northern District of Indiana court found *SWANCC* did not affect the Corps' exercise of jurisdiction over wetlands where that exercise is not based upon the Migratory Bird Rule, but instead, on the fact that "water. . . in the wetlands will inevitably flow towards and mix with water from connecting bodies, including the Little Calumet River." *United States v. Rueth Development Co.*, No. 2:96-cv-540, (N.D. Ind. Sept. 25, 2001) (unpublished; copy attached as Exhibit B to Plaintiff's Response to Defendant's Motion for Summary Judgment). *Rueth* observed that, because water in Rueth's wetland was certain to intermingle with water from the navigable river, the relationship between the two was direct and there was a "significant nexus" to a navigable waterway. *Id.* Accordingly, the Corps acted properly in exercising its regulatory jurisdiction under the Act. *Id.*

A court in this district noted that *SWANCC* does not clarify at what point between the two extremes – isolated waters, on the one hand, and wetlands directly

adjacent to navigable waters, on the other – a nonnavigable body of water falls within the Act's definition. *United States v. Krilich*, 152 F. Supp. 2d 983, 988 (N.D. Ill. 2001) (Hart, J.). The *Krilich* court concluded, however, that *SWANCC* does indicate that wetlands will likely need a connection to navigable-in-fact waters in order to be "waters of the United States" under the Act. *Id.* In *Krilich*, the court denied defendant's motion to vacate its consent decree regarding violations under the Act, because it found that *SWANCC* did not alter the legal framework under which the consent decree was entered into in a manner that would justify litigating whether the wetlands are actually isolated. *Id. See also United States v. Interstate General Co.*, 152 F. Supp. 2d 843, 847 (D. Md. 2001) (where *SWANCC* explicitly declined to determine the precise meaning of "navigable waters" as used in § 404(g) of the Act, it would be improper to extend the *SWANCC* ruling beyond invalidation of the Migratory Bird Rule).

In *United States v. Buday*, 138 F. Supp. 2d 1282, 1287-88 (D. Mont. 2001), defendant moved to withdraw his plea of guilty, made just hours before the Supreme Court decided *SWANCC*, to charges of discharging pollutants into wetlands adjacent to a creek. The court denied that motion, noting that 33 CFR § 328(a)(3) and the Migratory Bird Rule are based on the *effects* certain waters have on interstate commerce, rather than on their use as *channels* for interstate commerce, and that the Supreme Court has found regulations based on waters as *channels* of interstate commerce are consistent with the Act and the Commerce Clause.

This court finds the reasoning of the cases following *Headwaters* persuasive, and

agrees with those courts that *SWANCC* did not effect so substantial a change in the Corps' jurisdiction. Much of the *SWANCC* opinion has no direct relevance here because that case involved isolated waters lacking a physical/hydrological connection to other navigable waters. The *SWANCC* decision acknowledged that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the [Act] in *Riverside Bayview Homes.*" *SWANCC,* 531 U.S. at 167. Thus, in this court's view, the critical issue is whether there is a "significant nexus" between the Property's wetlands and the Fox River.

The Corps asserts jurisdiction over the wetlands on the Property on the basis of an allegedly unbroken line of surface water from the Property's wetlands to a tributary of Brewster Creek, which is itself a tributary to the navigable Fox River. (Plaintiff's Memorandum in Support of its Motion for Summary Judgment at 1-2; Plaintiff's Response to Lamplight's Motion for Summary Judgment at 1-2.) Lamplight challenges the Corps' characterization of the line of water as unbroken. While this appears to be a question of fact inappropriate for resolution on summary judgment, Lamplight has conceded certain facts that allow the court to resolve this issue.

Attempting to show that there is not a continuous flow of surface water off of the Property, Lamplight asserts that the drainage ditch ends fifty feet east of a meandering swale which carries water in a noncontinuous flow to the tributary of Brewster Creek. Despite this statement, Lamplight has conceded facts that show that there is, at least sometimes, an unbroken line of water from the wetlands at issue to the Brewster Creek tributary. The court notes first, that the mere fact that the actual

14

structure of the drainage ditch ends fifty feet east of the drainage swale does not speak to whether water flows between the end of the drainage ditch and the point at which the water enters what Lamplight calls the "meandering drainage swale." Plaintiff asserts that the line is unbroken, and one of Lamplight's shareholders acknowledged in his deposition that the line of water between the drainage ditch and the delta (or "meandering swale") flowing westward downhill to Brewster Creek had, in the last year, become unbroken. (Moxley Dep., Exhibit 3 to Plf. Facts, p. 33.) Further, as noted earlier, Lamplight admits that there is a hydrological connection between the wetlands at issue and the tributary to Brewster Creek after rain events and during certain (presumably wet) seasons. (Lamplight Facts, ¶ 21.)

Water need not flow in an unbroken line at all times to constitute a sufficient connection to a navigable water or its tributaries; as recognized by other courts, intermittent flow of the type Lamplight has acknowledged can be sufficient to establish the Corps' jurisdiction. In *Headwaters,* for example, the court observed that "[e]ven tributaries that flow intermittently are "waters of the United States." *Headwaters,* 243 F.3d at 534. In that case, the fact that man-made irrigation canals were occasionally blocked off from the natural streams into which they flowed by gates did not prevent those canals from being "waters of the United States." *Id.* Similarly, the Eleventh Circuit found that there was no reason to think that Congress intended to exclude tributaries that flow only intermittently from "waters of the United States" because "[p]ollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage." *United States v. Eidson,* 108 F.3d

1336, 1342 (11th Cir. 1997). That court concluded that where pollutants were discharged into a sewer drain that flowed into an open drainage ditch, that flowed during high tide and heavy rains into a drainage canal, that emptied into a creek that is a tributary to Tampa Bay, this was a discharge into "waters of the United States." *Id.*

Lamplight contends that wetlands cannot be adjacent to "waters of the United States" or their tributaries by virtue of what Lamplight calls a "drainage connection" because Corps regulations do not explicitly provide that drainage connections can be a measure of adjacency. (Lamplight's Opposition at 8-9; 33 CFR § 328.3(c).) The court does not find this reasoning compelling. First, Lamplight does not explain what it means by "drainage connection," nor does Lamplight provide a basis for distinguishing such a "connection" from any other flow of water. In any event, the Corps' failure to specifically identify drainage connections as a measure of adjacency cannot be interpreted as an explicit exclusion of drainage connections as such a measure. The Corps regulations define "adjacency" without listing the types of water flow or connections that may constitute adjacency, but instead identify the characteristics of "adjacency" as "bordering, contiguous, or neighboring." 33 CFR 328.3(c). In fact, this court concludes that the "drainage connection" between the wetlands and the tributary of Brewster Creek does establish adjacency: the dictionary definition of "contiguous" is "being in actual contact: touching along a boundary or at a point." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 250 (10th ed. 1997). By virtue of the path of water, whether it be a delta, a meandering swale, or a drainage connection, the

wetlands come into actual contact with the tributary of Brewster Creek.

The Supreme Court's analysis in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134-35 (1985), supports this conclusion. In that case, the Court found that the Corps' conclusion that "adjacent wetlands are inseparably bound up with the 'waters' of the United States," was not unreasonable. *Id.* at 134. In finding that this conclusion applied equally to wetlands that are not themselves the result of flooding or permeation by adjacent bodies of open water, the Court emphasized that "wetlands that are not flooded by adjacent waters may still tend to drain into those waters" and these wetlands "may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water." *Id.* at 134-45. As noted earlier, *SWANCC* acknowledged the continuing validity of *Riverside Bayview Homes*.

Lamplight asserts that Brewster Creek is not navigable, implying that this fact alone is outcome determinative here. As explained earlier, however, *SWANCC* did not limit Corps jurisdiction under the Act to navigable waters and wetlands adjacent to navigable waters. Thus, whether or not Brewster Creek is navigable does not end the court's inquiry. Cases both before and after *SWANCC* have found that a tributary need not have a direct connection to the navigable water, but may be linked through other connections two or three times removed from the navigable water and still be subject to the Corps' jurisdiction. In *Eidson*, the court observed that "as long as the tributary would flow into the navigable body of water 'during significant rainfall,' it is capable

of spreading environmental damage and is thus a 'water of the United States' under the Act." 108 F.3d at 1342. Similarly, in *Buday*, 138 F. Supp. 2d at 1291, the court noted case law from the Courts of Appeals that strongly suggests that tributaries three times removed from navigable waters can fall under federal jurisdiction. Even where the distance from the tributary to the navigable water is significant, the quality of the tributary is still vital to the quality of the navigable waters.

The court concludes that the wetlands on the Property are subject to the Corps' jurisdiction.

## Lamplight's Earlier Permit is Not Applicable

Lamplight's final argument is that, even if the court finds that the Corps has jurisdiction, the fill Lamplight discharged to build the path was authorized by the Nationwide Permit 26 it received in 1993. Lamplight claims that the total acreage it filled, even with the disputed horse path, was less than the amount it was authorized to fill by virtue of its 1993 permit, .75-acre. (Lamplight's Opposition to Plaintiff's Motion for Summary Judgment at 12-13.) It is undisputed, however, that Lamplight's 1993 permit authorized only the construction of additional parking areas and a pond; Lamplight did not apply for, nor did it receive, approval to build a road or a path through the wetlands. (Lamplight's Nationwide Permit 26 Application, Exhibit 2 to Lamplight's 56.1(B); Letter from Mitchell Isoe, Chief of the Corps' Regulatory Branch, to Thomas Moxley dated March 25, 1994, Exhibit 3 to Lamplight's 56.1(B).) Furthermore, the Corps' letter to Lamplight giving it permission to proceed with constructing the parking areas and the pond explicitly states that the "verification is

valid for two years from the date of this letter [March 25, 1994] unless the nationwide permit is modified, reissued or revoked. . . [and] [i]f the activity is not undertaken within the two year period, or the project specifications have changed, you must immediately notify this office to determine the need for further approval or reverification." (Letter from Mitchell Isoe, Chief of the Corps' Regulatory Branch, to Thomas Moxley dated March 25, 1994, Exhibit 3 to Lamplight's 56.1(B).) Lamplight does not suggest, nor provide any evidence, that its permit was modified or reissued. The terms of the letter from Mitchell Isoe to Moxley make explicit that Lamplight was not authorized by its 1993 permit to construct the path at issue.

## Civil Penalty

According to Section 309 of the Act, 33 U.S.C. § 1319, this court must impose a civil penalty of up to $25,000 per day for each violation. "In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d). Pertinent facts to consider here include that the road was removed by October 23, 2000, and that the vegetation in the affected wetland has since reestablished. (Lamplight Memo at 2.) It is also important to consider Lamplight's efforts to get the road removed. Throughout its submissions to this court, Lamplight repeatedly referred to the fact that it had quickly contacted a contractor to remove the fill, but that there were various unexpected delays caused by weather and other

scheduling conflicts. (*See, e.g.*, Lamplight Memo at 2.) The court is puzzled by Lamplight's explanation for some of the delays: "[t]he contractor went to the property to remove the fill in the spring and summer of 2000. He was unable to do so because the equipment was interfering with the horse shows and potentially endangering riders." (Lamplight's 56.1(B).) This explanation at least suggests that Lamplight made a decision to delay compliance with the Corps' directions in favor of holding its horse shows during the spring and summer of 2000. If the path was truly so insignificant a feature on the Property as Lamplight emphasizes, it seems possible that Lamplight could have conducted horse shows on the 52-acre Property without disrupting or being disrupted by the contractor's work.

## CONCLUSION

Plaintiff's motion for summary judgment (Doc. No. 9) as to liability is granted. Lamplight's motion for summary judgment (Doc. No. 20) is denied. Status conference is set for April 9, 2002 at 9:00 a.m., for purposes of scheduling an evidentiary hearing on the appropriate amount of damages.

ENTER:

Dated: March 8, 2002

REBECCA R. PALLMEYER
United States District Judge